**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| AUDIO POD IP, LLC,<br><br>                              Plaintiff,<br><br>        v.<br><br>AMAZON.COM, INC., AMAZON.COM LLC,<br>AMAZON WEB SERVICES, INC., AND<br>AUDIBLE, INC.,<br><br>                              Defendants. | Case No. 1:24-cv-444<br><br>Jury Trial Demanded |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Audio Pod IP, LLC ("Audio Pod") files this complaint against Amazon.com, Inc., Amazon.com LLC, Amazon Web Services, Inc., and Audible, Inc. (hereinafter collectively "Amazon" or "Defendants") for infringement of United States Patent Nos. 8,738,740; 9,319,720; 9,954,922; 10,091,266; 10,237,595; and 10,805,111 (the "Patents-in-Suit"), attached here as Exhibits 1-6. Audio Pod alleges that Defendants have willfully and/or otherwise infringed one or more of the Patents-in-suit.

## NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§1 *et seq*.

## THE PARTIES

2.      Audio Pod is a limited liability company organized under laws of the Commonwealth of Virginia with its principal place of business at 8609 Westwood Center Drive, Suite 110, Tysons Corner, Virginia 22182.

3.      On information and belief, defendant Amazon.com, Inc. is a corporation organized and existing under the laws of the state of Delaware with a principal place of business at 410 Terry Ave N, Seattle, Washington 98109-5210.

4.      On information and belief, Amazon.com, Inc. may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808, or anywhere it may be found.

5.      Amazon.com, Inc. does business across the United States, including in the Commonwealth of Virginia and, more specifically, in the Eastern District of Virginia.

6.      On information and belief, defendant Amazon.com LLC is a limited liability corporation organized and existing under the laws of the state of Delaware and a wholly-owned subsidiary of Amazon.com, Inc, with a principal place of business at 410 Terry Ave N, Seattle, Washington 98109-5210.

7.      On information and belief, Amazon.com LLC may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808, or anywhere it may be found.

8.      Amazon.com LLC does business across the United States, including in the Commonwealth of Virginia and, more specifically, in the Eastern District of Virginia.

9.      On information and belief, defendant Amazon Web Services, Inc. ("AWS") is a corporation organized and existing under the laws of the state of Delaware with a principal place of business at 410 Terry Ave N, Seattle, Washington 98109-5210.

10.     AWS is a subsidiary and controlled affiliate of defendant Amazon.com, Inc. and a so-called Amazon Group Company.

11.     On information and belief, AWS may be served with process through its registered agent, Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, VA, 23219 - 4100 or anywhere it may be found.

12.     AWS does business across the United States, including in the Commonwealth of Virginia and, more specifically, in the Eastern District of Virginia.

13.     On information and belief, AWS has been authorized to transact business in the Commonwealth of Virginia and the Eastern District of Virginia since on or about January 25, 2013, under Virginia Entity ID F1918947.

14.     On information and belief, defendant Audible, Inc. is a corporation organized and existing under the laws of the state of Delaware with a principal place of business at One Washington Park, 16th Floor, Newark, New Jersey 07102.

15.     Audible, Inc. is a subsidiary and controlled affiliate of defendant Amazon.com, Inc. and a so-called Amazon Group Company.

16.     On information and belief, Audible, Inc. may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808, or anywhere it may be found.

17.     Audible, Inc. does business across the United States, including in the Commonwealth of Virginia and, more specifically, in the Eastern District of Virginia.

18.     On information and belief, Defendants sell and offers to sell products and services throughout Virginia, including in this judicial district, as well as throughout the United States, and introduces products and services that perform infringing processes into the stream of commerce knowing that they would be used, offered for sale, or sold in this judicial district and elsewhere in the United States.

19.     On information and belief, Amazon has made, used, offered to sell, offered to sell access to, sold, and/or sold access to products and services, including the following specifically accused products and services: (1) Audible and Audible Library (unless otherwise stated, collectively "Audible"); (2) current or legacy products or services, which use, or have used, one or more of the foregoing products and services as a component product or component service, including audiobooks offered through Kindle Unlimited and Prime Reading; (3) combinations of products and/or services comprising, in whole or in part, two or more of the foregoing products and services; and (4) all other current or legacy products and services imported, made, used, sold, or offered for sale by Amazon that operate, or have operated in a substantially similar manner as the above-listed products and services. (As used herein, one or more of the forgoing products and services are individually and collectively referred to as the accused "Amazon Products and Services").

20.     On information and belief, Amazon, as well as the hardware and software components comprising the Amazon Products and Services and/or that enable the Amazon Products and Services to operate, including but not limited to servers, server software, webserver software, webserver hardware, email server hardware, email server software, website client software, mobile computing device client application software, networked communications hardware, network routers, network switches, network hubs, WIFI access point hardware, WIFI access point software, point-of-sale hardware, point-of-sale software, back-end hardware, back-end software, cloud-based software, cloud-based hardware, and other hardware and software computing systems and components infringes (literally and/or under the doctrine of equivalents) at least one claim of each of the Patents-in-Suit.

## JURISDICTION AND VENUE

21.     This civil action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*. Accordingly, this Court has subject matter jurisdiction under at least 28 U.S.C. §§ 1331 and 1338(a).

22.     This Court has general and specific personal jurisdiction over the Defendants because they regularly conduct and solicit business, or otherwise engage in other persistent courses of conduct in this judicial district, and/or derive substantial revenue from the use, sale, and distribution of goods and services, including but not limited to the accused Amazon Products and Services provided to individuals and businesses in the Eastern District of Virginia.

23.     On information and belief, Amazon infringes the Patents-in-Suit in the Eastern District of Virginia, at least, by making, using, offering to sell access to, and/or selling access to the accused Amazon Products and Services in this district.

24.     Amazon is the world's largest online retailer and marketplace and provider of cloud computing services through AWS. Amazon distributes a variety of downloadable and streaming content through its Amazon Prime Video, Amazon Music, and Audible units. Amazon also produces retail consumer electronics including the Kindle e-reader.

25.     On information and belief, Amazon is the second largest private employer in the United States.  According to the Virginia Economic Development Partnership, Amazon has since 2010 invested more than $109 billion in Virginia, including infrastructure and compensation to employees, and has created more than 36,000 jobs in the Commonwealth.[1]

---

[1] *See* https://www.vedp.org/press-release/2023-09/amazon-virginiabeach#:~:text=Since%202010%2C%20Amazon%20has%20invested,direct%20jobs%20in%20the%20Commonwealth.

26.     Amazon officially opened its "HQ2"—i.e. its second headquarters—in Arlington, Virginia and plans to add more than 25,000 new jobs to the more than 30,000 employees it already has in the Virginia and Washington, DC metro area.[2] Amazon's new headquarters are within this judicial district in the National Landing neighborhood of Arlington, Virginia. According to Amazon, the new Arlington campus features energy-efficient offices, neighborhood retail, and new public and green spaces including 1.1 acres of new public open space, designed for a variety of uses, including a dog park, recreation areas, farmers markets, and more to help realize the community's vision for a large, centrally-located park. *Id*.

27.     On information and belief, the accused Amazon Products and Services are made, used, sold and offered for sale by Amazon throughout the Eastern District of Virginia.

28.     On information and belief, Amazon customers located in the Eastern District of Virginia have obtained access to and used the accused Amazon Products and Services while located in the Eastern District of Virginia.

29.     This Court has personal jurisdiction over Amazon because, inter alia, Amazon, on information and belief: (1) has committed acts of patent infringement in this Eastern District of Virginia; (2) maintains a regular and established place of business, namely its HQ2 in Arlington, within the Eastern District of Virginia; (3) has substantial, continuous, and systematic contacts with this Commonwealth and the Eastern District of Virginia; (4) owns, manages, and operates facilities in this Commonwealth and the Eastern District of Virginia; (5) enjoys substantial income from its operations and sales in this Commonwealth and the Eastern District of Virginia; (6) employs Virginia residents in this Commonwealth and the Eastern District of Virginia, and

---

[2] See https://www.aboutamazon.com/workplace/corporate-offices.

(7) solicits business using the Amazon Products and Services in this Commonwealth and the Eastern District of Virginia.

30.     On April 9, 2020, this Court held,

> It must be said that Amazon is nothing if not ubiquitous in the United States. Furthermore, after considering 238 cities, Amazon chose Arlington in the Eastern District of Virginia as the location for its HQ2 and will invest $2.5 billion and 25,000 jobs in the undertaking. As such, Amazon cannot in good faith represent to the Court that E.D. Va. is an undesirable or inconvenient location to operate and do business. Litigating should not be an additional significant strain.

*Maglula, Ltd. v. Amazon.com, Inc.*, No.  1:19-cv-01570, ECF No. 52 at 32-33 (E.D. Va. Apr. 9, 2020).

31.     Venue is proper pursuant to 28 U.S.C. §§ 1391 and/or 1400(b), at least because Amazon has committed acts of infringement in this judicial district, and has a regular and established places of business in this judicial district. Venue is also proper for the reasons set forth by the Court in its *Maglula* decision. *See* 1:2019-cv-01570 (E.D. Va. Apr. 9, 2020), D.I. 52.

32.     In fact, Amazon has already admitted that venue is proper in this District. In *Amazon.com, Inc. v. WDC Holdings LLC*, No. 1:20-cv-484, ECF No. 1, ¶ 26 (E.D. Va. Apr. 27, 2020), Amazon argued that venue in this district was proper because "it is a district in which Plaintiff [Amazon] maintains headquarters and/or substantial business operations…"

## THE ASSERTED PATENTS

### U.S. Patent No. 8,738,740

33.     On May 27, 2014, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 8,738,740 ("the '740 patent") entitled "Transmission of digital audio data" to inventors John McCue, Robert McCue, Gregory Shostakovsky, and Glenn McCue.

34.     The '740 patent is presumed valid under 35 U.S.C. § 282.

35.     Audio Pod owns all rights, title, and interest in the '740 patent.

36.     Audio Pod has not granted Defendants an approval, an authorization, or a license to the rights under the '740 patent.

37.     The '740 patent relates to, among other things, "segmenting an audio stream into a plurality of small digital audio files using gaps in the natural language of the audio stream. '740 patent, Col. 2, lines 34-36.

38.     These small digital audio files are then "transmitted, loaded, and played, in a specific order, such that from the user's perspective, the audio stream is reproduced in an apparently seamless manner." *Id*. at 36-39.

39.     This manner of creating digital audio files also allows for media to be consumed by an end user without significant delay and in a timely manner. *Id*. at 40-48.

40.     The '740 patent also describes a descriptor, which according to the claims includes "at least one of a start time, an end time, and a play time of each digital audio file in the plurality of digital audio files within the audio stream." '740 patent, Col. 18, lines 47-49.

**U.S. Patent No. 9,319,720**

41.     On April 19, 2016, the USPTO duly and legally issued United States Patent No. 9,319,720 ("the '720 patent") entitled "System and method for rendering digital content using time offsets" to inventors John McCue, Robert McCue, Gregory Shostakovsky, and Glenn McCue.

42.     The '720 patent is presumed valid under 35 U.S.C. § 282.

43.     Audio Pod owns all rights, title, and interest in the '720 patent.

44.     Audio Pod has not granted Defendants an approval, an authorization, or a license to the rights under the '720 patent.

45.     The '720 patent builds upon the invention of the '740 patent and relates to, among other things, the delivery, management and rendering of multiple segmented streams of digital content in a synchronized rendering in dependence of the timeline of a media stream defined in a virtual media descriptor.

46.     The '720 patent also describes a descriptor file, which according to the claims includes "time information for each digital data file in each media stream, the time information for synchronizing the plurality of media streams and determined relative to a timeline of an audio recording of the originating written work." '720 patent, Col. 40, lines 32-37.

47.     The patent further notes that the "digital content to be rendered is selected using the time information in the descriptor file and a time offset external to the descriptor file." *Id.*

48.      The '720 patent solves, among other things, problems with, and improves upon, the speed and availability of access to digital content by a consumer. Further, it allows the consumer to select the structure of the multimedia rendering takes and customize it as needed.

## U.S. Patent No. 9,954,922

49.     On April 24, 2018, the USPTO duly and legally issued United States Patent No. 9,954,922 ("the '922 patent") entitled "Method and system for rendering digital content across multiple client devices" to inventors John McCue, Robert McCue, Gregory Shostakovsky, and Glenn McCue.

50.     The '922 patent is presumed valid under 35 U.S.C. § 282.

51.     Audio Pod owns all rights, title, and interest in the '922 patent.

52.     Audio Pod has not granted Defendants an approval, an authorization, or a license to the rights under the '922 patent.

53.     The '922 patent specification is nearly identical to the specification of the '740 patent and solves the problems described in the '740 patent.

**U.S. Patent No. 10,091,266**

54.     On October 2, 2018, the USPTO duly and legally issued United States Patent No. 10,091,266 ("the '266 patent") entitled "Method and system for rendering digital content across multiple client devices" to inventors John McCue, Robert McCue, Gregory Shostakovsky, and Glenn McCue.

55.     The '266 patent is presumed valid under 35 U.S.C. § 282.

56.     Audio Pod owns all rights, title, and interest in the '266 patent.

57.     Audio Pod has not granted Defendants an approval, an authorization, or a license to the rights under the '266 patent.

58.     The '266 patent specification is nearly identical to the specification of the '740 patent and solves the problems described in the '740 patent.

**U.S. Patent No. 10,805,111**

59.     On October 13, 2020, the USPTO duly and legally issued United States Patent No. 10,805,111 ("the '111 patent") entitled "Simultaneously rendering an image stream of static graphic images and a corresponding data stream" to inventors John McCue, Robert McCue, Gregory Shostakovsky, and Glenn McCue.

60.     The '111 patent is presumed valid under 35 U.S.C. § 282.

61.     Audio Pod owns all rights, title, and interest in the '111 patent.

62.     Audio Pod has not granted Defendants an approval, an authorization, or a license to the rights under the '111 patent.

63.     The '111 patent specification is nearly identical to the specification of the '720

patent and solves the problems described in the '720 patent.

## BACKGROUND OF THE INVENTIONS

64.     Computer scientists and brothers John, Robert and Glenn McCue, along with

engineer Gregory Shostakovsky, are inventors on the Patents-in-Suit. The McCues, all software

architects, conceptualized the streaming audiobook idea to help their mother enjoy literature in

spite of her failing eyesight. The entrepreneurs incorporated Audio Pod Inc. in 2005, with

Gregory Shostakovsky as CEO, and went on to invent several key media streaming technologies.

65.     By proposing streaming functionalities where users could simply connect to a

server and listen to an audio file, their solutions solved the cumbersome process that, at the time,

required users to mass download entire media streams, store the entire stream on their computers,

and find a player to play such download media. They invented, among other things, means to

segment and sequence the media prior to streaming the media so that the media could be

streamed in parts. This approach overcame a major limitation at the time in mass downloading

entire media streams (when large book downloads were taking hours over slow networks).

66.     Further, they invented the idea of bookmarking the digital content such that a

stream could be paused and played at a later time, and/or even on a different device.  Further,

Audio Pod developed a subscriber service where users could stream content for a monthly

service rather than purchasing whole downloads.  In 2006, they launched a subscriber-paid

service to stream audiobooks to consumer devices.

67.     Audio Pod's innovative concepts and early technology development was

headlined in The Ottawa Citizen newspaper in January 2008.



From left, brothers John, Robert, Glenn McCue and Gregory Shostakovsky have created software call Audio Pod, which allows audio books to be enjoyed more easily through laptops, phones and other devices.

# Entrepreneurs tap into growing audio book market

### Electronic bookmark among Ottawa company's innovations

BY JEFF BUCKSTEIN

Ten years ago John Mc-Cue began looking for a way to help his mother, Monica, continue her lifelong love affair with literature in spite of her failing eyesight.

Now Mr. McCue's Ottawa firm is ready to market innovative technology that allows users to easily listen to audio books and other spoken word streams on their laptop computers, portable PDAs, or any device that can play an MP3 file.

And as a bonus, the soft-

ware program offers an electronic bookmark system that lets users stop listening and then return to the book exactly where they left off — even on a different device.

That adaptability and ease of use are key signatures of the patent-pending technology offered by Audio Pod Inc., which Mr. McCue, its senior software architect, co-founded with Gregory Shostakovsky in need. Robert McCue and Glenn McCue, John's brothers, are also software architects with the firm.

The technology is "a significant software development that has taken a lot of hours of work" Mr. Shostakovsky claims proudly. "No one has even been close to anything like this."

Because Audio Pod is a pure software design, there is no need for the user to manually download, store and transfer audio content. There are no CDs to manage or files to transfer.

It taps into a hot market. According to the Audio Publishers Association, sales of audio books in 2005 in the U.S. alone were estimated at $923 million, up six per cent over 2003.

"What's wonderful about audio books is that as more

people discover them (they) pass on the word and we continue to grow," says association president Michele Cobb, who is based in North Kingstown, Rhode Island.

This tremendous growth in popularity suits a busy society of time-pressed people who like to read books "and still be able to multi-task," she adds.

The entrepreneurs stress that no matter how large an audio file is, it is accessible in a fast, reliable manner using their technology, and can also easily be bookmarked and picked up again wherever and whenever the reader chooses.

See AUDIO on PAGE 13

*See* Exhibit 7.

## CONTACT WITH AMAZON

68.     On information and belief, Amazon acquired audiobook publisher Brilliance Audio in May 2007.

69.     A few months after this acquisition, in July 2007, Audio Pod met with Brilliance Audio, the then-leading audiobook publisher selling books on cassette tapes and CDs. During this meeting, Audio Pod demonstrated its technology in real-time and explained ways in which Brilliance could revolutionize its product offering using the Audio Pod technology.

70.     Within eighteen months of that meeting, Amazon had incorporated much of the technology Audio Pod disclosed to Brilliance into its Kindle and Audible platforms.

71.     After the Brilliance Audio acquisition, Audio Pod approached Amazon several times to collaborate on or acquire the Audio Pod technology.

72.     In or about December 2012 and January 2013, Audio Pod CEO Gregory Shostakovsky wrote to Amazon's Vice President of IP Acquisitions,

> I would like to draw your attention to the latest Kindle product offering and the Intellectual Property owned by Audio Pod Inc. In our opinion, there is a marked similarity between some of the newest features contained within the Kindle and some of our Intellectual property. Specifically in technology areas related to "Whispersynch for Voice" and "Immersion Reading," among others.

73.     As of the date of the filing of the instant Complaint, Amazon has never responded to any of Audio Pod's attempts to engage in licensing discussions.

74.     Amazon has been aware of the Patents-in-Suit and/or the Audio Pod technology since at least as early as 2007 and no later than 2013, and it has continued to willfully infringe, thereby warranting enhanced damages and attorneys' fees as set forth more fully below.

## CLAIMS FOR RELIEF

### COUNT I - Infringement of the '740 Patent by Audible

75.     Audio Pod repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs above.

76.     On information and belief, Defendants (or those acting on their behalf) make, use, sell, sell access to, import, offer to sell and/or offer to sell access to Audible in the United States that infringe (literally and/or under the doctrine of equivalents) at least claim 12 of the '740 patent.

77.     On information and belief, one or more components of Audible employ or provide computer readable code (e.g. Audible Cloud Player, an HTML-based player that uses HLS technology for streaming) that is executed by a computer.



*See* Screenshot capture from Amazon Audible running on a web browser on a computer.

> ## How can I listen to Audible audiobooks?
>
> The great thing about Audible audiobooks is that you can listen to them almost anywhere! Our audiobooks can be listened to on a number of devices and surfaces - even through the Audible website!
>
> Even though you can listen on multiple devices, the Audible app available on iOS, Android, and Windows 10 features the best listening experience. You can listen wherever you go and you don't need Wi-Fi to listen!

*See* https://audible.custhelp.com/app/answers/detail/a_id/5134.

> **▾ What devices can I listen on?**
>
> You can listen to your titles on iOS (Apple iPhone, Apple Watch, iPad), Android, Sonos and Alexa-enabled devices. And when you switch a device, your title will pick up right where you left off.

*See* https://www.audible.com/ep/audiblelatino-howto#:~:text=You%20can%20listen%20to%20your,exchange%20it%20and%20choose%20another.

     78.    On information and belief, one or more components of Audible employ or provide computer readable code, which when executed by a computer, causes said computer to determine a first position within an audio stream playing on a media player (e.g., the current playback position could be the first position in the media stream).



*See* screenshot capture from Amazon Audible running on a web browser on a computer.

79.     On information and belief, one or more components of Audible employ or provide computer readable code, which when executed by a computer, causes said computer to determine a time offset using a point in time of the first position from a beginning of the audio stream.

## Cloud Player

In order to enable playback for our users, we decided to build a web based streaming player. This allows our users to listen to their books without having to install any software in most cases. Initially we choose to utilize Silverlight for the player due to the fairly wide install base and because Smooth Streaming with DRM is supported by the player without additional libraries. The player is an HTML and javascript component for the UI which controls the Silverlight player. We built it in a modular way in case we ever decided to move away from Silverlight. The player manages the DRM, downloads and buffers the audio and allows for scrubbing around the audio stream. We also store and retrieve the user's position, and keep it synched across all devices, allowing for seamless moving from device to device. We call this system "Whispersync".

## HLS/HDS

Silverlight worked well for us and our users, but we knew we would want to expand to devices that didn't support Silverlight like mobile devices, and the bevy of living room players. In order to support this, we decided to use a combination of HLS and HDS. HLS, or HTTP Live Streaming, is Apple's streaming protocol and is supported natively in Safari and on iOS. Many devices like Chromecast, Roku, and Amazon Fire TV also support HLS. HDS, or HTTP Dynamic Streaming, is Adobe's HTTP Adaptive streaming protocol. We decided to HDS this as it fills the gaps for browsers that do not support HLS. Flash, which has a much higher install base than Silverlight can be used when HLS is not supported. Between the two, we support nearly every browser, platform, and device. As the streaming assets are quite similar to Smooth Streaming, with fragments and a manifest file, playback works similarly as well. We process the files in the same flow, and in fact still encode to Smooth Streaming as it supports offline playback better than HLS and HDS.

*See* http://stn.audible.com/streaming/.



*See* screenshot capture from Amazon Audible running on a web browser on a computer.

80.    On information and belief, one or more components of Audible employ or provide computer readable code, which when executed by a computer, causes said computer to create a bookmark for the first position, the bookmark including a file, the file including a unique identifier for identifying the audio stream and including the time offset (e.g., when the user stops streaming the audiobook, Audible creates a bookmark for the particular audio so that the user can resume listening).

**Cloud Player**

In order to enable playback for our users, we decided to build a web based streaming player. This allows our users to listen to their books without having to install any software in most cases. Initially we choose to utilize Silverlight for the player due to the fairly wide install base and because Smooth Streaming with DRM is supported by the player without additional libraries. The player is an HTML and javascript component for the UI which controls the Silverlight player. We built it in a modular way in case we ever decided to move away from Silverlight. The player manages the DRM, downloads and buffers the audio and allows for scrubbing around the audio stream. We also store and retrieve the user's position, and keep it synched across all devices, allowing for seamless moving from device to device. We call this system "Whispersync".

*See* http://stn.audible.com/streaming/.

81.     On information and belief, the created bookmark is for positioning the audio stream to the first position using the time offset (e.g, when the user stops streaming the audiobook, Audible creates a bookmark for the particular audio so that the user can resume listening). *Id*.

82.     On information and belief, the audio stream is stored as a plurality of digital audio files in a library, each digital audio file including a different segment of the audio stream (e.g. the audio portion (e.g. audio stream) of the media content is chunked into multiple segments (e.g. digital audio files) and each segment contains different portions of the audio content).



*See* Fiddler capture from Amazon Audible running on a web browser on a computer.



*See*
https://developer.apple.com/library/archive/documentation/NetworkingInternet/Conceptual/StreamingMediaGuide/HTTPStreamingArchitecture/HTTPStreamingArchitecture.html#//apple_ref/doc/uid/TP40008332-CH101-SW2.



*See* http://stn.audible.com/streaming/ and
https://developer.apple.com/library/archive/documentation/NetworkingInternet/Conceptual/Strea
mingMediaGuide/HTTPStreamingArchitecture/HTTPStreamingArchitecture.html#//apple_ref/d
oc/uid/TP40008332-CH101-SW2.

83.     On information and belief, one or more components of Audible employ and

provide computer readable code that is further configured to cause said computer to determine a

first digital audio file from the plurality of digital audio files to be loaded for playback with the

media player from the first position, the first digital audio file selected using the time offset and a

descriptor file, the descriptor file for ordering the plurality of digital audio files and including at

least one of a start time, an end time, and a play time of each digital audio file in the plurality of

digital audio files within the audio stream.



*See* Fiddler capture from Amazon Audible running on a web browser on a computer.

84.     On information and belief, one or more components of Audible employ and provide computer readable code that is further configured to cause said computer to determine if the first digital audio file is resident within the computer (e.g. among other things, the web player buffers the segments in its cache. Initially, when the user loads the content, the segments are not available in the client buffer. The segments are streamed from the server, cached in the buffer, in case the segment is not available).

**Cloud Player**

In order to enable playback for our users, we decided to build a web based streaming player. This allows our users to listen to their books without having to install any software in most cases. Initially we choose to utilize Silverlight for the player due to the fairly wide install base and because Smooth Streaming with DRM is supported by the player without additional libraries. The player is an HTML and javascript component for the UI which controls the Silverlight player. We built it in a modular way in case we ever decided to move away from Silverlight. The player manages the DRM, downloads and buffers the audio and allows for scrubbing around the audio stream. We also store and retrieve the user's position, and keep it synched across all devices, allowing for seamless moving from device to device. We call this system "Whispersync".

*See* http://stn.audible.com/streaming/

85.     On information and belief, one or more components of Audible employ and provide computer readable code that is further configured to cause said computer to download the first digital audio file from the library in dependence upon whether the first digital audio file is already resident within the computer. *Id.*

86.     On information and belief, one or more components of Audible employ and provide computer readable code that is further configured to cause said computer to load the first digital audio file for playback with the media player from the first position. *Id.*

87.     On information and belief, Defendants directly infringe at least claim 12 of the '740 patent in violation of 35 U.S.C. § 271(a) by making, using, selling, selling access to, importing, offering for sale, and/or offering to sell access to Audible.

88.     Defendants' infringement has damaged Audio Pod and caused/continues to cause it to suffer irreparable harm and damages.

## COUNT II - Infringement of the '720 patent by Audible

89.     Audio Pod repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs above.

90.     On information and belief, Defendants (or those acting on their behalf) make, use, sell, sell access to, import, offer to sell and/or offer to sell access to Audible in the United States that infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the '720 patent.

91.     On information and belief, one or more components of Audible provide a method of rendering digital content.

92.     On information and belief, one or more components of Audible provide a method of rendering digital content by providing a media player having access to at least one server via a network, the at least one server having stored thereon a descriptor file and a plurality of media streams derived from a same originating written work (e.g., Audible running on the client device accesses the Akamai backend and comprising the following multiple media streams: 1. Audible Captions, 2. Audio), each media stream including a plurality of digital data files (e.g. the audio (media stream) is broken down into fragments (plurality of digital data files)), the descriptor file including information allowing a simultaneous synchronized rendering of the plurality of media streams (e.g. Audible synchronizes audio with the audible captions (media streams). The

23

manifest file is used for synchronizing the streams) that provides a literary experience of the originating written work (e.g. Audible comprises audiobooks that are based on books/novels (originating written work).  Audible comprises multiple media files like Audible Captions and Audio), the information including time information for each digital data file in each media stream, the time information for synchronizing the plurality of media streams and determined relative to a timeline of an audio recording of the originating written work.

> As new content is ingested, the audio files are processed by this system, transcoded to different bit rates and then encrypted with PlayReady DRM. The encrypted files are then processed into streaming assets which contain a manifest, essentially a listing of all of the audio fragments, as well as the fragments themselves. We can request the audio in non-sequential order and play from any point with only minimal lag time. Finally, we upload to Akamai which provides optimizations for caching and content distribution.

See http://stn.audible.com/streaming/

> In order to enable playback for our users, we decided to build a web based streaming player. This allows our users to listen to their books without having to install any software in most cases. Initially we choose to utilize Silverlight for the player due to the fairly wide install base and because Smooth Streaming with DRM is supported by the player without additional libraries. The player is an HTML and javascript component for the UI which controls the Silverlight player. We built it in a modular way in case we ever decided to move away from Silverlight. The player manages the DRM, downloads and buffers the audio and allows for scrubbing around the audio stream. We also store and retrieve the user's position, and keep it synched across all devices, allowing for seamless moving from device to device. We call this system "Whispersync".

*Id.*

> **3. How is Captions different from an eBook?**
>
> Audible Captions does not make an eBook available to customers. It does not replicate or replace the print or eBook reading experience. Text is displayed progressively, and only a few lines at a time, while audio is playing, and listeners cannot read at their own pace or flip through pages as they could with a print book or eBook.

See https://www.audible.com/about/newsroom/audible-captions-a-demonstration.

```
Each Media Segment MUST carry the continuation of the encoded
bitstream from the end of the segment with the previous Media
Sequence Number, where values in a series such as timestamps and
Continuity Counters MUST continue uninterrupted.  The only exceptions
are the first Media Segment ever to appear in a Media Playlist and
Media Segments that are explicitly signaled as discontinuities
(Section 4.3.2.3).  Unmarked media discontinuities can trigger
playback errors.
```

*See* https://datatracker.ietf.org/doc/html/rfc8216#page-6.

93.     On information and belief, one or more components of Audible provide a method of rendering digital content by determining a first digital data file from the plurality of digital data files in a first media stream from the plurality of media streams (e.g. when the user taps the play button, the player determines the correct encoded alternative based on the current network conditions (determining) to download the segment (digital data file) of the requested audio content (first media stream)), the first digital data file having digital content to be rendered with the media player, and determined using the time information in the descriptor file and a predetermined time offset, the predetermined time offset external to the descriptor file and determined relative to the timeline of the audio recording (e.g. when the user taps the play button, it continues to play from where the user left off).

> As new content is ingested, the audio files are processed by this system, transcoded to different bit rates and then encrypted with PlayReady DRM. The encrypted files are then processed into streaming assets which contain a manifest, essentially a listing of all of the audio fragments, as well as the fragments themselves. We can request the audio in non-sequential order and play from any point with only minimal lag time. Finally, we upload to Akamai which provides optimizations for caching and content distribution.

*See* http://stn.audible.com/streaming/

94.     On information and belief, one or more components of Audible provide a method of rendering digital content by downloading the first digital data file or a digital data segment

contained in the first digital data file and determined using the time information in the descriptor file from the at least one server so that the digital content is resident with the media player (e.g. when the user taps on the play button, the player downloads and buffers the audio stream from where the user left off). *Id*.

95.     On information and belief, Audible renders the digital content using the media player at an arbitrary point determined using the predetermined time offset. *Id*.

96.     On information and belief, Defendants directly infringe at least claim 1 of the '720 patent in violation of 35 U.S.C. § 271(a) by making, using, selling, selling access to, importing, offering for sale, and/or offering to sell access to Audible.

97.     Defendants' infringement has damaged Audio Pod and caused/continues to cause it to suffer irreparable harm and damages.

## COUNT III - Infringement of the '922 patent by Audible

98.     Audio Pod repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs above.

99.     On information and belief, Defendants (or those acting on their behalf) make, use, sell, sell access to, import, offer to sell and/or offer to sell access to Audible in the United States that infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the '922 patent.

100.     On information and belief, one or more components of Audible provide a method for rendering digital content across multiple client devices (e.g., a desktop, smartphones, computers, tablets). As shown below, Audible provides an audiobook library that can be accessed from any device with the use of an Audible account.



*See* https://help.audible.com/s/article/listen-in-the-app.

101.    On information and belief, one or more components of Audible provide a method for downloading first digital content corresponding to a media work from a network accessible library to a first client device via a network, the first digital content including at least a first portion of a first media stream. Audible configures the first client device to download first digital content corresponding to a media work from the network accessible library via the network, the first digital content including at least a first portion of a first media stream. As shown below, the first client device loads (e.g., download) 'Introduction' (e.g., first digital content) of the contents of 'How to train your mind' (e.g., a media work) in segments (e.g., first digital content including at least a first portion of a first media stream). The Audible system further comprises a first client device. As shown below, Audible can be accessed using an Audible account from any first device (e.g., first client device) among a number of devices.




*See* Screenshots from product testing.

In 2020, users have come to expect a flawless streaming media experience, whether it's video, music, or audiobooks. Playback must start quickly and be resilient to changes in network availability and bandwidth. To deliver all of this content, you must have a performant, highly available and reliable Content Delivery Network (CDN) to reach customers worldwide. But what do you do if your infrastructure is not able to evolve with your requirements? Audible, an Amazon company, faced these challenges over 2019-2020 which motivated our move to Amazon CloudFront for our Audio Streaming Infrastructure. Click here to learn more about edge networking with AWS.

*See* https://aws.amazon.com/blogs/networking-and-content-delivery/cloudfront-migration-series-part-2-audible-plus-the-turning-point/.



*See* https://aws.amazon.com/blogs/networking-and-content-delivery/cloudfront-migration-series-part-2-audible-plus-the-turning-point/.



*See* https://www.audible.com/howtolisten.

102.    On information and belief, one or more components of Audible provide a method for storing the first digital content on the first client device. As shown below, Audible utilizes the device (e.g., first device) storage space for downloaded content.



*See* Screenshot taken during product testing.



*See* https://www.quora.com/Will-the-books-I-have-from-Audible-take-up-space-on-my-iPhone.



*See* https://www.quora.com/Will-the-books-I-have-from-Audible-take-up-space-on-my-iPhone.

103.     On information and belief, one or more components of Audible provide a method for rendering at least a portion of the first digital content. Audible renders (e.g., plays/provides the media) at least a portion of the first digital content (e.g., the book) when requested. *Id.*

104.     On information and belief, one or more components of Audible provide a method for tracking a current position in the first media stream as the first digital content is rendered. As shown above, Audible displays the time progress bar (e.g., track a current position) when the 'Introduction' (e.g., the first digital content) of the audio stream 'How to train your mind' is played (e.g., rendered). *Id.*

105.     On information and belief, one or more components of Audible provide a method for creating a bookmark by setting the current position as a bookmarked position, the bookmark including information for identifying the media work and the bookmarked position. As shown below, Audible creates bookmarks (e.g., the stop point) for every unfinished title that also shows

the position where it was left previously (e.g., the time). The bookmark includes information for identifying the media work and the bookmarked position (e.g., title of book and position).



*See* Screenshot taken during product testing.

106.    On information and belief, one or more components of Audible provide a method for transferring the bookmark to a second client device via the network. As shown below, Audible allows its account to be used on multiple devices (e.g., second client device) such that all the saved/downloaded audiobooks automatically sync for the purposes of resuming playback (e.g., transfer the bookmark).



*See* https://help.audible.com/s/article/remove-devices-from-account.

See https://help.audible.com/s/article/listen-in-the-app.

107.    On information and belief, one or more components of Audible provide a method for downloading second digital content corresponding to the media work from the network accessible library to the second client device via the network, the second digital content including at least a second portion of the first media stream or at least a portion of a second media stream, the second portion of the first media stream or the portion of the second media stream including the bookmarked position. The second digital content includes at least a second portion of the first media stream. As shown below, the second client device loads (e.g., downloads) "Introduction" (e.g., first digital content) of the contents of "How to train your mind" (e.g., a media work) from the same position where it was left in the other device. Further, the content is fetched/downloaded in segments (e.g., second digital content including at least a second portion of the first media stream).





*See* Screenshots taken during product testing.

In 2020, users have come to expect a flawless streaming media experience, whether it's video, music, or audiobooks. Playback must start quickly and be resilient to changes in network availability and bandwidth. To deliver all of this content, you must have a performant, highly available and reliable Content Delivery Network (CDN) to reach customers worldwide. But what do you do if your infrastructure is not able to evolve with your requirements? Audible, an Amazon company, faced these challenges over 2019-2020 which motivated our move to Amazon CloudFront for our Audio Streaming Infrastructure. Click here to learn more about edge networking with AWS.

*See* https://aws.amazon.com/blogs/networking-and-content-delivery/cloudfront-migration-series-part-2-audible-plus-the-turning-point/.



*See* https://aws.amazon.com/blogs/networking-and-content-delivery/cloudfront-migration-series-part-2-audible-plus-the-turning-point/.

108.    On information and belief, one or more components of Audible provide a method for storing the second digital content on the second client device. *Id*.

109.    On information and belief, one or more components of Audible provide a method for rendering at least a portion of the second digital content on the second client device depending upon the bookmarked position. *Id*.

110.    On information and belief, one or more components of Audible provide a method for identifying a range of content surrounding the bookmarked position in the second digital content as content to be retained. As shown below, Audible allows to go forward and backward (e.g, identify range of content) from the bookmarked position of any audiobook. This indicates that Audible identifies the range of content surrounding the bookmarked position in the second digital content as content to be retained.

> Once CloudFront has managed to pull twenty 1 MB ranges into cache, it optimizes subsequent requests by asynchronously downloading the remainder of the file to the edge. Once the download completes, every request from then on is guaranteed to be a cache hit. This translates to better performance for the end user as the user "walks" through the file, bringing subsequent bytes into the cache without relying on other users. This helps give the first user a similar experience as subsequent users who hit a primed cache.

*See* https://aws.amazon.com/blogs/networking-and-content-delivery/cloudfront-migration-series-part-2-audible-plus-the-turning-point/.

111.    On information and belief, one or more components of Audible provide a method for releasing storage resources allocated to all content of the second digital content that is not identified as content to be retained on the second client device. As shown below, Audible auto-removes the downloaded titles, once it is marked as finished (e.g., identify content as not to be retained). Therefore, Audible lets the mobile device (e.g., second client device) to free up some memory that has been utilized for the downloaded tiles (e.g., second digital content).



*See* https://www.viwizard.com/audiobook-tips/remove-audible-books.html.

1. Launch the Audible app on your mobile device.

2. Tap "Profile."

3. Tap the Gear icon to navigate to your account settings.

4. Tap "Data & storage."

5. Swipe down and look for an option labeled "Auto-Remove." Audible provides this option that allows you to automatically remove downloaded titles after you marked them as finished.

6. Toggle the switch or adjust the settings to enable the "Auto-Remove" feature. This ensures that the audiobooks are automatically removed from your device after you've finished listening.

*See* https://www.viwizard.com/audiobook-tips/remove-audible-books.html.

112.    On information and belief, one or more components of Audible provide a method where if insufficient storage is available, it narrows the range of content surrounding the bookmarked position that is identified as content to be retained. As shown below, when the user switches streams (e.g., content identified to be retained) on a resource constrained device (e.g., insufficient storage available in the second client device), Audible narrows the range of content by fetching new manifests and creating new buffers. This holds true for the content surrounding the bookmarked position. *Id*.



**Chapter by Chapter Streaming**

Chapter by Chapter streaming is where devices will specifically ask to stream a title a chapter at a time, internally building a playlist of chapters. When users navigate between chapters, the player will actually switch streams, fetching new manifests and creating new buffers.

This is typically used on resource constrained devices that can't fit large manifest files in memory.

*See* https://aws.amazon.com/blogs/networking-and-content-delivery/cloudfront-migration-series-part-2-audible-plus-the-turning-point/.

113.    On information and belief, Defendants directly infringe at least claim 1 of the '922 patent in violation of 35 U.S.C. § 271(a) by making, using, selling, selling access to, importing, offering for sale, and/or offering to sell access to Audible.

114.    Defendants' infringement has damaged Audio Pod and caused/continues to cause it to suffer irreparable harm and damages.

**COUNT IV - Infringement of the '266 patent by Audible**

115.    Audio Pod repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs above.

116.    On information and belief, Defendants (or those acting on their behalf) make, use, sell, sell access to, import, offer to sell and/or offer to sell access to Audible in the United States that infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the '266 patent.

117.    On information and belief, one or more components of Audible provide a method of rendering digital content across multiple client devices (e.g., a desktop, smartphones, computers, tablets). As shown below, Audible provides an audiobook library that can be accessed from any device with the use of an Audible account.

118.    On information and belief, one or more components of Audible provide a method comprising rendering on a first client device at least a portion of primary digital content.




*See* Screenshot taken during product testing.

119.     On information and belief, one or more components of Audible provide a method comprising determining on the first client device an identifier corresponding to the primary digital content, wherein the identifier identifies a descriptor of the primary content. *Id.*

120.     On information and belief, one or more components of Audible provide a method comprising determining on the first client device a first position in the primary digital content. *Id.*

121.     On information and belief, one or more components of Audible provide a method comprising transferring the identifier and the first position from the first client device to a second client device via a network accessible library.

# How do I sync my listening across devices?

The Audible app will automatically sync your listening position across devices.

To turn it off, go to your Player settings and then toggle the **Sync listening position** slider off then on again.

*See* https://help.audible.com/s/article/listen-in-the-app.

122.     On information and belief, one or more components of Audible provide a method comprising downloading the descriptor from the network accessible library to the second client device by using the identifier.

In 2020, users have come to expect a flawless streaming media experience, whether it's video, music, or audiobooks. Playback must start quickly and be resilient to changes in network availability and bandwidth. To deliver all of this content, you must have a performant, highly available and reliable Content Delivery Network (CDN) to reach customers worldwide. But what do you do if your infrastructure is not able to evolve with your requirements? Audible, an Amazon company, faced these challenges over 2019-2020 which motivated our move to Amazon CloudFront for our Audio Streaming Infrastructure. Click here to learn more about edge networking with AWS.

*See* https://aws.amazon.com/blogs/networking-and-content-delivery/cloudfront-migration-series-part-2-audible-plus-the-turning-point/.



*See* https://aws.amazon.com/blogs/networking-and-content-delivery/cloudfront-migration-series-part-2-audible-plus-the-turning-point/.

123.    On information and belief, one or more components of Audible provide a method comprising rendering on the second client device at least a portion of secondary other digital content associated with the primary digital content by using the descriptor and the first position, wherein the secondary digital content is ancillary to the primary digital content, and wherein the secondary digital content is rendered on the second client device simultaneously and in synchronization with the rendering of the primary digital content on the first client device. *Id*.

124.    On information and belief, one or more components of Audible provide a method comprising identifying a range of content surrounding the first position in the primary digital content as content to be retained.

Once CloudFront has managed to pull twenty 1 MB ranges into cache, it optimizes subsequent requests by asynchronously downloading the remainder of the file to the edge. Once the download completes, every request from then on is guaranteed to be a cache hit. This translates to better performance for the end user as the user "walks" through the file, bringing subsequent bytes into the cache without relying on other users. This helps give the first user a similar experience as subsequent users who hit a primed cache.

*See* https://aws.amazon.com/blogs/networking-and-content-delivery/cloudfront-migration-series-part-2-audible-plus-the-turning-point/.

125.    On information and belief, one or more components of Audible provide a method comprising releasing storage resources allocated to all content of the primary digital content that is not identified as content to be retained on the first client device.



*See* https://www.viwizard.com/audiobook-tips/remove-audible-books.html.

1. Launch the Audible app on your mobile device.
2. Tap "Profile."
3. Tap the Gear icon to navigate to your account settings.
4. Tap "Data & storage."
5. Swipe down and look for an option labeled "Auto-Remove." Audible provides this option that allows you to automatically remove downloaded titles after you marked them as finished.
6. Toggle the switch or adjust the settings to enable the "Auto-Remove" feature. This ensures that the audiobooks are automatically removed from your device after you've finished listening.

*See* https://www.viwizard.com/audiobook-tips/remove-audible-books.html.

126.   On information and belief, one or more components of Audible provide a method comprising identifying content in the secondary digital content that is related to the range of content surrounding the first position in the primary digital content as content to be retained.

Once CloudFront has managed to pull twenty 1 MB ranges into cache, it optimizes subsequent requests by asynchronously downloading the remainder of the file to the edge. Once the download completes, every request from then on is guaranteed to be a cache hit. This translates to better performance for the end user as the user "walks" through the file, bringing subsequent bytes into the cache without relying on other users. This helps give the first user a similar experience as subsequent users who hit a primed cache.

*See* https://aws.amazon.com/blogs/networking-and-content-delivery/cloudfront-migration-series-part-2-audible-plus-the-turning-point/.



*See* Screenshot taken during product testing.

127.     On information and belief, one or more components of Audible provide a method comprising releasing storage resources allocated to all content of the secondary digital content that is not identified as content to be retained on the second client device.



*See* https://www.viwizard.com/audiobook-tips/remove-audible-books.html.

1. Launch the Audible app on your mobile device.
2. Tap "Profile."
3. Tap the Gear icon to navigate to your account settings.
4. Tap "Data & storage."
5. Swipe down and look for an option labeled "Auto-Remove." Audible provides this option that allows you to automatically remove downloaded titles after you marked them as finished.
6. Toggle the switch or adjust the settings to enable the "Auto-Remove" feature. This ensures that the audiobooks are automatically removed from your device after you've finished listening.

*See* https://www.viwizard.com/audiobook-tips/remove-audible-books.html.

128.   On information and belief, Defendants directly infringe at least claim 1 of the '266 patent in violation of 35 U.S.C. § 271(a) by making, using, selling, selling access to, importing, offering for sale, and/or offering to sell access to the Audible.

129.   Defendants' infringement has damaged Audio Pod and caused / continues to cause it to suffer irreparable harm and damages.

### COUNT VIII - Infringement of the '111 patent by Audible Library

130.   Audio Pod repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs above.

131.   On information and belief, Defendants (or those acting on their behalf) make, use, sell, sell access to, import, offer to sell and/or offer to sell access to Audible Library in the United States that infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '111 patent.

132.   On information and belief, one or more components of the Audible Library provide a method comprising accessing, by a client device, (e.g., smartphone or computer running the accused products) a network accessible library (e.g., the Audible Library) having stored thereon an image stream of static graphic images (e.g., a book image stream) and a corresponding audio stream (e.g., audio narration stream). As seen below, a computer accessing the Audible Library has static graphic images of book titles that correspond to an audio stream.



*See* https://robots.net/how-to-guide/how-does-audible-work-your-guide-to-amazon-audiobooks/.

133.    On information and belief, one or more components of the Audible Library provide a method comprising downloading to the client device (e.g., smartphone or computer running the accused product) from the network accessible library (e.g., the Audible Library) one or more static graphic images (e.g., a book image), wherein the one or more static graphic images are associated with time information including at least one of a start time, an end time, and a duration relative to a timeline of the audio stream (e.g. *see below*, identifying audio stream length as "20 hrs and 43 mins").



*See* https://www.audible.com/pd/Fourth-Wing-Audiobook/B0BVD25SYT?plink=BQ3zydh4ife0l5CN&ref_pageloadid=Xm2HlBxeRWtdMQZ8&ref=a_pd_A-Cour_c5_adblp13npsbx_1_1&pf_rd_p=ffa7f6c6-3bca-45d4-9f4c-816d1f5fdd73&pf_rd_r=9FG2XV9ZY35HZPY1TD3N&pageLoadId=cBWDVUhus6zLXhyG&creativeId=1dfe4386-f6dc-4021-b08a-483cfe6b0bb1.

134.    On information and belief, one or more components of the Audible Library provide a method comprising assembling, by the client device (e.g., smartphone or computer running the accused products), a first page from the one or more static graphic images (e.g., a page from the book image stream).

135.    On information and belief, one or more components of the Audible Library provide a method comprising assigning to the first page, by the client device, (e.g., smartphone

or computer running the accused products) time information including at least one of a start time, an end time, and a duration relative to the timeline (*See* e.g., below, a duration time) of the audio stream (e.g., audio narration stream), wherein the time information for the first page is determined on the basis of the time information for the one or more static graphic images (e.g., a page from the book image stream).



*See* https://apps.apple.com/us/app/audible-audio-entertainment/id379693831?ign-itscg=30200&ign-itsct=apps_box_promote_link&platform=iphone.

136.    On information and belief, one or more components of the Audible Library provide a method comprising downloading to the client device (e.g., smartphone or computer running the accused products) from the network accessible library (e.g., the Audible Library) a portion of the audio stream (e.g., part of the audio narration stream) including a first time offset (e.g., start time of the selected text), wherein the first time offset corresponds to a first position on the first page (e.g., start time of a selected text for corresponding page).



*See* https://apps.apple.com/us/app/audible-audio-entertainment/id379693831?ign-itscg=30200&ign-itsct=apps_box_promote_link&platform=iphone (*See e.g.*, the time information of the Audible Audiobooks is downloaded to the client device from a network accessible library. Where a portion (*e.g.*, "8h 19m left" or "14h 24m") is a time offset assigned to the first page of the audio stream).

137.    On information and belief, one or more components of the Audible Library provide a method comprising simultaneously rendering the first page and the portion of the audio stream on the client device (e.g., smartphone or computer running the accused products) by using the time information for the one or more static graphic images or for the first page (e.g., a page from the book image stream), wherein the portion of the audio stream is rendered in dependence upon the first time offset (e.g., start time of the selected text).  On information and belief, the

simultaneously rendered first page, and a portion of the Audible Audiobook audio stream on the client device (e.g., iPhone) use the time information for the first page. A portion of the audio stream is rendered in dependence upon the first time offset.

 

*See* https://apps.apple.com/us/app/audible-audio-entertainment/id379693831?ign-itscg=30200&ign-itsct=apps_box_promote_link&platform=iphone.

138.   On information and belief, Defendants directly infringe at least claim 1 of the '111 patent in violation of 35 U.S.C. § 271(a) by making, using, selling, selling access to, importing, offering for sale, and/or offering to sell access to Audible.

139.   Defendants' infringement has damaged Audio Pod and caused/continues to cause it to suffer irreparable harm and damages.

**JURY DEMANDED**

140.    Pursuant to Federal Rule of Civil Procedure 38(b), Audio Pod hereby requests a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

Audio Pod respectfully requests this Court to enter judgment in Audio Pod's favor and against Amazon as follows:

a.      finding that Amazon has infringed one or more claims of the '740 patent under 35 U.S.C. § 271(a);

b.      finding that Amazon has infringed one or more claims of the '720 patent under 35 U.S.C. § 271(a);

c.      finding that Amazon has infringed one or more claims of the '922 patent under 35 U.S.C. § 271(a);

d.      finding that Amazon has infringed one or more claims of the '266 patent under 35 U.S.C. § 271(a);

e.      finding that Amazon has infringed one or more claims of the '111 patent under 35 U.S.C. § 271(a);

f.      awarding Audio Pod damages under 35 U.S.C. § 284, or otherwise permitted by law, including enhanced damages for willful infringement and/or supplemental damages for any continued post-verdict infringement;

g.      awarding Audio Pod pre-judgment and post-judgment interest on the damages award and costs;

h.      awarding cost of this action (including all disbursements) and attorney fees pursuant to 35 U.S.C. § 285, or as otherwise permitted by the law; and

i.      awarding such other costs and further relief that the Court determines to be just

and equitable.

Dated: March 20, 2024                          Respectfully submitted,

                                               /s/ Chandran B. Iyer
                                               Ronald M. Daignault (pro hac vice to be filed)*
                                               Chandran B. Iyer (VA Bar No. 94100)
                                               Kevin H. Sprenger (VA Bar No. 98588)
                                               rdaignault@daignaultiyer.com
                                               cbiyer@daignaultiyer.com
                                               ksprenger@daignaultiyer.com
                                               DAIGNAULT IYER LLP
                                               8618 Westwood Center Drive - Suite 150
                                               Vienna, VA 22182
                                               Tel.: (202) 330-1666

                                               *Attorneys for Plaintiff Audio Pod LLC*

                                               *\*Not admitted to practice in Virginia*